USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: SEP 2 7 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
EUGENE C. SHEPHERD,

               Plaintiff,

    -v-

JAMES POWERS et al.,

               Defendants.

------------------------------------------------------x

No. 11 Civ. 6860(LTS)(RLE)

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Eugene Shepherd ("Plaintiff") brings this action, principally pursuant to

42 U.S.C. § 1983, alleging that Defendants Westchester County, Westchester County Health

Care Corporation ("WCHCC"), New York Medical College ("NYMC"), New York Correct Care

Solutions Medical Services, P.C. ("NYCCSMS"), Correct Care Solutions, LLC ("CCS"), and

several individual employees of these entities, violated his constitutional rights while he was in

pre-trial confinement in the Westchester County Jail ("WCJ"). Westchester County

Defendants,[1] NYMC, and NYCCSMS/CCS have each moved pursuant to Federal Rule of Civil

---

[1]    The County Defendants are Westchester County; WCHCC; Westchester Medical
Center; Joseph Spano ("Spano"), the Deputy Commissioner of Westchester
County DOC from January 1, 2006 through July 27, 2008, and Commissioner of
DOC from July 28, 2008 through December 31, 2009 (Second Amended
Complaint ("SAC" or "Complaint") ¶ 13); Kevin Cheverko ("Cheverko"),
Commissioner of Westchester County DOC from January 1, 2010 to date (id.
¶ 14); Anthony Amicucci ("Amicucci"), the Warden of the WCJ from January 1,
2006 through approximately June 2010 (id. ¶ 15); Marcelo Diaz ("Diaz"), the
Warden of the WCJ from June 2010 to date (id. ¶ 16); WCJ correctional officers
James Powers ("Powers"), Robert O'Dell ("O'Dell"), Mervin Enders ("Enders"),
and Kevin Johnson ("Johnson") (id. ¶ 17, 19); Sgt. Karim Haspil ("Hapsil") and
Sgt. Jose Pena ("Pena"), supervising corrections officer in the WCJ (id. ¶ 18);
Emergency Response Team ("ERT") Members #1-#3 (id. ¶ 19). The County
Defendants' motion to dismiss is also brought on behalf of Karl Adler ("Adler"),
M.D., President of NYMC (id. ¶ 20); NYMC employees, Randy Goldberg

Procedure 12(b)(6) for an order dismissing Plaintiff's Second Amended Complaint ("SAC" or

the "Complaint") for failure to state a claim upon which relief can be granted.  The Court has

subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1367.  The Court has

thoroughly reviewed the parties' submissions and, for the reasons set forth below, the County

Defendants' motion to dismiss the Complaint is granted in part and denied in part.  NYMC and

NYCCSMS/CCS's motions to dismiss the Complaint are granted in full.

BACKGROUND

The following facts are alleged in Plaintiff's Complaint and are accepted as true

for purposes of this motion practice.

Factual Allegations Concerning Plaintiff's Mistreatment

From April 19, 2009, through August 6, 2010, and August 10, 2010, through

August 20, 2010, Plaintiff was a pre-trial detainee in custody of the WCJ.  (SAC ¶ 78.)  On

March 9, 2010, Plaintiff had a "verbal disagreement" with Powers – a guard known as

"Superman" on account of his aggression and use of excessive force on inmates – over the

apparent fact that he was the only inmate who was subjected to a full strip search upon returning

from court.  (Id. ¶¶ 80, 81.)  As Plaintiff stripped naked, Powers drove a table into Plaintiff's

legs, jumped across the table, grabbed Plaintiff's bare genitals, and squeezed them with great

force as he slammed Plaintiff's head and back against a wall, furniture, and the floor.  This

caused severe injury and pain to Plaintiff's head, back, and genitals.  (Id. ¶ 82.)  Defendants

Pena, Pectol, Nunez, Haspil, O'Dell, Johnson, Enders, and ERT Members #1-#3 assisted Powers

in applying excessive force: Enders applied excessively tight leg restraints and Pena sat on

---

("Goldberg"), M.D., and Gail Bailey-Wallace ("Bailey-Wallace") (id. ¶ 21); and
Michael Israel ("Israel"), President and Chief Executive Officer of WCHCC.  (Id.
¶ 23.)

Plaintiff's back and attempted to "break, dislocate or rip off [Plaintiff's] fingers on his right hand, causing severe injury and pain." (Id. ¶¶ 83-84.)  At no time did Plaintiff resist or fail to comply with any directives of the WCJ staff.  (Id. ¶ 84.)  After Plaintiff was brought to his feet and relieved of the restraints, he was given a prison uniform and directed to get dressed.  (Id. ¶ 85.)  Plaintiff then requested that he be given back his underclothes, a request which was denied.  (Id.)  When Plaintiff made the request a second time, Haspil warned Plaintiff that chemical agents would be used if he did not comply with the order to get dressed.  (Id. ¶ 86.)  As Plaintiff began to put the uniform on, Enders – a man significantly larger than Plaintiff – began pushing Plaintiff without cause.  (Id. ¶¶ 86-87.)  Plaintiff explained to the guards, "as he was facing Enders with his genitals exposed," that the uniform was too small.  (Id. ¶ 87.)  As he turned his back to the wall to remove the pants,  Enders grabbed him from behind and threw him to the floor; Haspil, Johnson, and ERT Members #1-#3 converged to reapply hand and leg restraints and began choking Plaintiff; O'Dell put down his shield and jumped on Plaintiff's back.  (Id. ¶¶ 87-88.)  Haspil and O'Dell yelled directives at Plaintiff to stop resisting, "in order to cover-up and justify their tactically contraindicated use of force," and despite the fact that Plaintiff displayed no resistance.  (Id. ¶ 88.)

Plaintiff was then brought to a medical station and seated in a chair.  (Id. ¶ 89.) While there, O'Dell intentionally stepped on Plaintiff's leg restraints, inflicting pain and lacerating his ankles.  Plaintiff alleges in the SAC that he was examined for a total of fourteen seconds, that his complaints of back pain were ignored by the nurse, and that he was released to the general population without being examined by a physician.  (Id.)  These allegations are seemingly inconsistent with Plaintiff's admission in an earlier complaint that he received over-the-counter medication to treat his pain and that he was provided an X-ray on his back and hand.

(See Pro Se Complaint, attached as Ex. B to County Defs' Mot. to Dismiss).

        Powers, Haspil, O'Dell, Johnson, and Enders submitted fraudulent reports of the incident, falsely stating that Plaintiff had acted in an aggressive manner.  Plaintiff alleges that these fraudulent reports were part of "Westchester County's custom and practice of using excessive force on inmates in the WCJ, and as part of and in furtherance of the conspiracy to cover-up their misconduct."  (SAC ¶ 92.)  Plaintiff alleges that the reports were objectively unbelievable, given the significant difference in size and strength between Plaintiff and the guards, and that a cursory review of the ERT video would have revealed the reports' falsity.  (Id. ¶ 93.)  An investigation of the incident was completed and reviewed by Defendants Cheverko and Amicucci pursuant to DOC policy.  (Id. ¶ 91.)  The report led to the filing of criminal charges, as to which Plaintiff was later acquitted.  (Id. ¶ 106)

        Apparently as a result of this false report, Plaintiff was placed in a Special Housing Unit ("SHU") for two months.  While in the SHU, Plaintiff was denied medical care, participation in a substance abuse program, access to legal assistance and materials, and participation in Sunday religious worship; his personal Bible was confiscated and has yet to be returned.  (Id. ¶ 99.)  The conditions in the SHU cell were deplorable: it reeked of excrement and vomit, food was splattered on the walls, mold was readily visible and growing on the walls, sink and shower, and Plaintiff was denied adequate blankets to protect him from "severely cold" temperatures.  (Id. ¶ 94.)  While in the SHU, Plaintiff submitted four or five medical Sick Call requests due to "severe pain in his back, fingers and genitals."  Some requests were denied outright; others were granted, but resulted in "only cursory examinations that consisted of asking one or two questions through Plaintiff's cell window."  (Id. ¶ 97.)

        After submitting multiple Sick Call requests, Plaintiff was directed to report to

Dr. Goldberg.  (Id. ¶ 98.)  When Plaintiff began to describe the condition of his back, Goldberg stated he was only examining Plaintiff for his asthma condition and directed Plaintiff to submit a separate Sick Call request for his back.  Plaintiff submitted a separate request, but was not provided a physical examination for his injuries.  (Id.)  Plaintiff was also denied an MRI because it was deemed "too expensive."  (Id. ¶ 101.)

Plaintiff was then transferred to the "Old Jail" for approximately thirty days, where he was held in "locked down" for sixteen hours each day.  During this period of time, Plaintiff was further denied medical care, participation in the substance abuse program, access to legal assistance and the law library.  (Id. ¶ 100.)

In July or August 2010, Plaintiff sought medical care, including pain medication, from Nurse Noe for physical injuries and pain in his back and fingers.  His request was denied and she refused to refer Plaintiff to a licensed physician or orthopedic specialist, stating, "Suck it up. You're going to have an abnormality in that finger. You have to learn to live with it."  (Id. ¶ 107.)  Upon being released from custody of the WCJ, medical personnel informed Plaintiff that he suffered from post-traumatic stress disorder as a result of the mistreatment.  (Id. ¶ 104.)

Allegations Against NYMC, WCHCC, and NYCCSMS/CCS

Plaintiff brings claims against NYMC, WCHCC, and NYCCSMS/CCS for denial of medical care and breach of contract, as well as pendent claims for medical negligence and intentional and negligent infliction of emotional distress.  Plaintiff alleges that Westchester County contracted with NYMC for the provision of primary medical care to inmates in the WCJ, from at least January 1, 2006, through July 25, 2010, and that this contract delegated to NYMC responsibility for creating, implementing and maintaining policies and procedures regarding the provision of care, including the medical grievance process, maintenance of inmate medical files

and referrals for advanced medical care. (<u>Id</u>. ¶ 27.) During this time, Bailey-Wallace and
Goldberg were the only two physicians employed by NYMC to provide and supervise primary
medical care to inmates. (<u>Id</u>. ¶ 28.) During the same time period, Westchester County entered
into a contract with WCHCC for the provision of nursing services to inmates in the WCJ. (<u>Id</u>.
¶ 29.) On July 26, 2010, Westchester County signed a contract transferring NYMC and
WCHCC's responsibilities to CCS and/or NYCCSMS. (<u>Id</u>. ¶ 30.)

       Plaintiff alleges, on information and belief, that NYMC, WCHCC and
NYCCSMS/CCS had possession, control of and/or unfettered access to his medical records, and
that the aforementioned contracts required WCHCC, NYMC, and NYCCSMS/CCS to refer
inmates to orthopedic specialists for complaints relating to the musculoskeletal system, and
required their employees or agents to provide medical care within the scope of their medical
licenses. (<u>Id</u>. ¶¶ 32-33.) Defendants' denial of medical care and the repeated failures to refer
Plaintiff to an orthopedic contravened these contracts. (<u>Id</u>. ¶¶ 103, 105.) Plaintiff further alleges
that Adler and Israel "knew or but for their deliberate indifference should have known of the
WCJ's custom and practice of failing to provide medical care to inmates in the WCJ, but failed
or refused to correct the same through training, supervision or discipline of Bailey-Wallace,
Goldberg and/or Kadel, for grossly negligent, reckless or intentional conduct" (<u>id</u>. ¶¶ 72, 73);
and that "Westchester County, WCHCC, NYMC, Adler and/or Israel, knew or should have
known that Bailey-Wallace and/or Goldberg engaged in professional misconduct with respect to
other inmates, but failed to discipline or discharge either of the two defendants." (<u>Id</u>. ¶ 76.)

<u>Allegations Regarding the County's Custom and Practice of Failing to Protect Inmates</u>

       Plaintiff's alleges that his mistreatment arose from a custom and practice of
subjecting inmates in the WCJ to excessive force and denying them adequate medical care. The

SAC identifies two other lawsuits brought by WCJ inmates in 2007 alleging excessive force and denial of medical care, and incorporates those complaints by reference. (Id. ¶¶ 39-40.)[2] After these lawsuits were filed, in August 2007, the Department of Justice ("DOJ") notified Westchester County of its intent to investigate the WCJ under the Civil Rights of Institutionalized Persons Act ("CRIPA"). (Id. ¶ 43.) In February 2008, DOJ conducted an on-site inspection in the WCJ. (Id. ¶ 44.) DOJ conveyed its preliminary findings and recommendations to WCJ officials and staff, legal counsel for the County, and policy level officials of NYMC and WCHCC, including Adler and Israel. (Id. ¶¶ 44-45, 47-49.) On November 19, 2009, DOJ served its Findings Letter on Westchester County. The Findings Letter provided in relevant part:

> WCJ has a pattern of failing to: (1) adequately protect inmates from harm and serious risk of harm from staff; and (2) provide inmates with adequate medical care. These deficiencies violate WCJ inmates' constitutional rights.
> We found evidence of a pattern and practice of use of excessive force by the Emergency Response Team.
>
> We found that WCJ inadequately reviews use of force incidents to prevent a pattern of use of excessive force against inmates.
>
> We find that WCJ fails to adequately document uses of force in its written reports, and thus fails to adequately protect inmates from harm.
>
> WCJ fails to adequately discipline officers for using excessive force against inmates . . . . In our investigation, we found that WCJ fails to initiate disciplinary measures to correct officers who use excessive force.
>
> [T]here are some areas where the medical care provided at WCJ falls below the constitutionally required standards of care. Specifically, we found the following deficiencies: . . . an inadequate medical grievance process.

---

[2]    Two such lawsuits are: Smith v. Westchester County Dept. of Corr., 07 Civ. 1803(SAS) (S.D.N.Y.); Jones v. Westchester County Dept. of Corrs. Med. Dept., 07 Civ. 3019(CM) (S.D.N.Y.).

> WCJ['s] policy for submitting grievances . . . is not consistently implemented or effectively publicized. According to the Grievance Mechanism, CHS-A-11, inmate complaints must be written on an inmate Grievance Form and submitted to WCJ staff. During our on-site visit, however, many of the corrections officers in WCJ's housing units did not have Grievance Forms available for inmates if requested. Further, when inmates and jail staff were asked where an inmate could get a form to file a grievance, both the inmates and jail staff provided inconsistent responses.

(Id. ¶ 50.) The Findings Letter recommended a number of remedial measures. (Id.) As with the preliminary findings, the conclusion of the Findings Letter was received and discussed by each of the Defendants. (Id. ¶¶ 54-56.) In December 2009 and February 2010, Spano and Cheverko stated publicly that they disagreed with the DOJ report's findings. (Id. ¶¶ 53, 57.)

In 2010 and 2011, after the Findings Letter was issued, five inmates of the WCJ filed suit alleging excessive use of force and/or denial of medical care.[3] (Id. ¶¶ 58-62.) Plaintiff incorporates the allegations in those complaints by reference.

Plaintiff alleges, on information and belief, that, since January 1, 2006, Westchester County, WCHCC, and NYMC have not disciplined any employees or agents for use of excessive force or denial of medical care to inmates in the WCJ, and that Westchester County has promoted and/or failed to discipline correction officers despite having surveillance video revealing that its officers repeatedly violated inmates' constitutional rights. (Id. ¶¶ 64, 66). The Complaint further alleges that Westchester County failed to train or supervise DOC personnel in the use of force pursuant to generally accepted professional standards of correctional practice, and that Westchester County, WCHCC, NYMC and/or NYSCCSMS/CCS failed to train or

---

[3]    These suits are: Barnes v. Westchester County, 10 Civ. 2916(SCR) (S.D.N.Y.); Barnes v. Westchester County, 10 Civ. 2916(SCR) (S.D.N.Y.); Bektic-Marrero v. Goldberg, 11 Civ. 1781(CM) (S.D.N.Y.); Bowen v. Patrick, 11 Civ. 4799(RJH) (S.D.N.Y.); and Michel v Westchester County, 15493/11 (Sup. Ct. Westchester County).

supervise their employees or agents in how to respond to the negligent or intentional denial of
medical care to inmates in the WCJ. (Id. ¶¶ 67-68, 70-71.)

DISCUSSION

In deciding a motion pursuant to Rule 12(b)(6), the Court accepts as true the
non-conclusory factual allegations in the complaint and draws all reasonable inferences in the
plaintiff's favor. Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007); see also Ashcroft v. Iqbal,
556 U.S. 662 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual
matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at
678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial
plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct alleged." Id. at 678.

I.      County Defendants' Motion to Dismiss

Plaintiff brings federal claims against the County Defendants for denial of
medical care, use of excessive force, infringement of Plaintiff's free exercise rights, malicious
prosecution, and unconstitutional conditions of confinement.  Defendants argue that the SAC
fails to state a cause of action for all but the excessive use of force claim.  Defendants also move
to dismiss all claims against the County on the grounds that Plaintiff has failed to plead that his
constitutional injury resulted from a policy or custom, as required by Monell v. Dep't of Social
Servs., 436 U.S. 658 (1978), and all claims against several of the individual Defendants on the
grounds that the Complaint fails to allege personal involvement.[4]

---

[4]      The County Defendants also contend that Plaintiffs' federal claims are barred by
         his failure to exhaust his remedies as required by the Prison Litigation Reform Act
         ("PLRA").  The PLRA provides in relevant part: "No action shall be brought with
         respect to prison conditions under section 1983 of this title, or any other Federal

A.   Denial of Medical Care Claim

Though cognizable under the Fourteenth Amendment, claims for failure to provide adequate medical care brought by individuals in pre-trial detention are analyzed under the same standard as those brought by convicted prisoners under the Eighth Amendment. Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009).  In order to establish an Eighth Amendment claim arising out of the provision of inadequate medical care, a prisoner must show "deliberate indifference to [his] serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104 (1976).  The standard of deliberate indifference includes both an objective and subjective component.  First, "the deprivation alleged by the prisoner must be in objective terms 'sufficiently serious' such that the deprivation 'den[ied] the minimal civilized measure of life's necessities.'" Branham v. Meachum, 77 F.3d 626, 630-31 (2d Cir. 1996) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  Second, the defendants "must have acted with deliberate indifference in that they 'kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" Id. (quoting Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994)).  To satisfy the subjective prong, a plaintiff must do more than simply plead that medical or prison personnel acted negligently.  See Estelle, 429 U.S. at 105-06 ("inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference").  Rather, a plaintiff must plead that

---

law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C.A. § 1997e(a) (West 2009).  This statute, however, mandates exhaustion only for those actions filed by prisoners while they are "confined."  The statute is inapplicable where, as here, the litigant commencing the action files suit after release from confinement.  See Grieg v. Goord, 169 F.3d 165, 167 (2d Cir. 1999) (per curiam); accord Talamantes v. Leyva, 575 F.3d 1021, 1024 (9th Cir. 2009); Prescott v. Annetts, 2010 WL 3020023, at *5 (S.D.N.Y. July 22, 2010); Lopez v. City of New York, 2009 WL 229956, at *3 (S.D.N.Y. Jan. 30, 2009).

the defendant acted with a state of mind akin to criminal recklessness. Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003). Moreover, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998).

While there is no bright-line test to measure the seriousness of a prisoner's medical condition, the Second Circuit has set forth factors to "guide the analysis." Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003). These include: "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." Id. (internal quotation marks and citations omitted). Plaintiff alleges that, while detained, he suffered "severe pain in his back, fingers and genitals," which limited his range of movement, and that, since his release, he continues to be treated for "severe pain and injury to his back and injury to his right hand." (SAC ¶¶ 95, 75.) Plaintiff's characterization of the pain he suffered – which the Court must credit as true at this stage – is sufficient to meet the objective prong. See, e.g., Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir. 1994) (hip condition that caused a prisoner "great pain over an extended period of time and . . . difficulty walking" deemed objectively serious); Nelson v. Rodas, No. 01 Civ. 7887(RCC), 2002 WL 31075804, at *14 (S.D.N.Y. Sep. 7, 2002), adopted by Order (S.D.N.Y. March 12, 2004) ("Severe back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment.").

However, the Complaint has failed to plead facts sufficient to meet the subjective prong. While Plaintiff alleges in the SAC that he never received an examination for the pain in

his back, Plaintiff admitted in an earlier complaint regarding the same claim that he received

over-the-counter medication to treat his pain and that he was provided an X-ray. (See <u>Pro Se</u>

Complaint, attached as Ex. B to County Defs' Mot. to Dismiss); <u>Sulton v. Wright</u>, 65 F. Supp. 2d

292, 295 (S.D.N.Y. 2003) ("Admissions in earlier complaints remain binding when a plaintiff

files subsequent pleadings.").  Plaintiff's allegation that he was denied a referral to a specialist

and an M.R.I. "because it was 'too expensive' and irrespective of his medical needs" cannot

salvage his deliberate indifference claim.  It is well settled that "the question whether . . .

[imaging] or additional diagnostic techniques or forms of treatment [are] indicated is a classic

example of a matter for medical judgment" and that the decision not to order certain diagnostic

tests "does not represent cruel and unusual punishment."  <u>Estelle v. Gamble</u>, 429 U.S. 97, 108

(1976).  Although that rule does not hold where treatment decisions are motivated by financial

considerations instead of sound medical judgment,[5] Plaintiff has not pled any facts in support of

his claim that treatment by a specialist or an M.R.I. was medically necessary.  See <u>Chance</u>, 143

F.3d at 702 ("subjective belief that something more should have been done to treat his medical

conditions" insufficient to state a deliberate indifference claim).  Accordingly, the Court finds

that the Complaint fails to state a claim for deliberate indifference to Plaintiff's medical needs.

     In light of the insufficiency of Plaintiff's federal claim for denial of medical care

---

[5]    See e.g., <u>Chance</u>, 143 F.3d at 702 (a plaintiff may establish the requisite culpability for a deliberate indifference claim where the doctors choose a course of treatment "not on the basis of their medical views, but because of monetary incentives"); <u>Jones v. Westchester County Dep't of Corr. Med. Dept.</u>, 557 F. Supp. 2d 408, 415 (S.D.N.Y. 2008) (refusing surgery "for the sole purpose of shifting the cost of his care to another institution" sufficient to establish culpable mental state); <u>Bob v. Armstrong</u>, 02 Civ. 1785(RNC), 2003 WL 22682335, at *2 (D. Conn. Aug. 26, 2003) ("If financial considerations induced [defendant] to ignore a substantial risk of harm to [plaintiff], the subjective element of the deliberate indifference test may be met.").

(Count IX), the Court declines pursuant to 28 U.S.C. § 1367(c)(3) to exercise supplemental

jurisdiction of the state claims for medical negligence and infliction of emotional distress.

B.      Conditions of Confinement

As with a claim predicated on the denial of medical care, a plaintiff claiming

unconstitutional conditions of confinement under the Fourteenth Amendment must allege both

(1) that he or she suffered a sufficiently, objectively serious deprivation and (2) that officials

who caused the harm acted or failed to act with a sufficiently culpable state of mind.  See Farmer

v. Brennan, 511 U.S. 825, 834 (1994); Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000).  As

to the objective prong, "the Constitution does not mandate comfortable prisons."  Rhodes v.

Chapman, 452 U.S. 337, 349 (1981).  To recover on a claim of unconstitutional prison housing

conditions, a plaintiff must allege that he or she was denied "the minimal civilized measure of

life's necessities," id. at 347, such as the "basic human needs" of "food, clothing, shelter, medical

care and reasonable safety."  Helling v. McKinney, 509 U.S. 25, 32 (1993) (internal quotation

marks and citation omitted).  Moreover, a plaintiff alleging unconstitutional conditions of

confinement must show something more than mere negligence; instead, a plaintiff must allege

that an "official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety."

Farmer, 511 U.S. at 837.

Plaintiff alleges that the conditions of his SHU cell were "deplorable" -- that the

cell "reeked of excrement and vomit, food was splattered on the walls, mold was readily visible

and growing on the walls, sink and shower" and that, despite the "severely cold temperatures,"

Plaintiff was denied adequate blankets.  (SAC ¶ 94.)  While foul odors and mold alone do not

implicate the Eighth or Fourteenth Amendments, the Supreme Court has stated that "[s]ome

conditions of confinement may establish an Eighth Amendment violation 'in combination' when

each would not do so alone. . . for example, a low cell temperature at night combined with a failure to issue blankets." Wilson v. Seiter, 501 U.S. 294, 304 (1991). Thus, the allegation that Plaintiff was kept in severely cold temperatures without adequate protection satisfies the objective prong.

However, Plaintiff's conditions of confinement claim fails for a separate reason: the Complaint does not allege that Plaintiff complained or otherwise notified prison personnel about the frigid temperatures or the lack of blankets. Nor does the Complaint allege that Defendants were aware of these conditions in the SHU. See Mitchell v. Keane, 974 F.Supp. 332, 334 (S.D.N.Y. 1997) (denying motion to amend on ground that allegation involving sewage dripping from cell ceiling failed to state a claim for a violation of prisoner's Eighth Amendment rights because proposed amended complaint did not include allegation that a correctional official or officer was aware of the condition in prisoner's cell), aff'd, 175 F.3d 1008 (2d Cir. 1999). Accordingly, Plaintiff's conditions of confinement claim (Count V) is dismissed.

C.   Free Exercise

Plaintiff alleges that County Defendants Enders and Powers violated his free exercise rights under the First Amendment by "placing Plaintiff in the [SHU] on the basis of fraudulent documents with knowledge that he would be denied access to his personal Bible and Sunday group worship," and "unreasonably denying him the same as a result of being housed in the [SHU]." (SAC ¶ 119.) Defendants move to dismiss this claim, arguing that Plaintiff's placement in the SHU "provides legal justification for any restriction as to [his] free exercise rights."[6] (County Defs' Mot. at 24.)

---

[6]     Plaintiff also brings a claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). 42 U.S.C. § 2000-cc1(a). Defendants have

Defendants' broad pronouncement is indefensible.  It is "well-established that prisoners have a constitutional right to participate in congregate religious services," Salahuddin v. Coughlin, 993 F.2d 306, 308 (2d Cir. 1993), and that restrictions on free exercise rights are only permissible where they are "reasonably related to legitimate penological interests." Pugh v. Goord, 571 F. Supp. 2d 477, 494 (S.D.N.Y. 2008) (quoting Turner v. Safley, 482 U.S. 78, 87 (1987)).  The Second Circuit has admonished that it is "error to assume that prison officials [are] justified in limiting [a detainee's] free exercise rights simply because [he or she is] in disciplinary confinement." Young v. Coughlin, 866 F.2d 567, 570 (2d Cir. 1989); see also LaReau v. MacDougall, 473 F.2d 974, 979 n. 9 (2d Cir. 1972) ("[N]ot every prisoner in segregation lawfully can be prevented from attending church services in the chapel . . . [because] [n]ot all segregated prisoners are potential troublemakers.").  Insofar as Plaintiff was placed in the SHU based on allegedly spurious disciplinary charges, there can be no legitimate penological rationale for the confiscation of his Bible and the refusal to allow him to participate in services.

Accordingly, the Court finds that the Complaint adequately pleads a free exercise claim.

D.   Malicious Prosecution Claim

Defendants also move to dismiss Plaintiff's malicious prosecution claim.  To state a claim for malicious prosecution a plaintiff must allege: "'(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" Jocks v. Tavernier, 316 F.3d 128, 136 (2d Cir. 2003) (quoting Murphy v.

---

not moved to dismiss that claim.

Lynn, 118 F.3d 938, 947 (2d Cir. 1997)).  Plaintiff has alleged that Powers, Haspil, O'Dell, Johnson, Enders, and ERT Members #1-#3[7] submitted false disciplinary charges against Plaintiff, as a result of which Plaintiff was charged criminally.  Plaintiff further alleges that the charges – of which he was ultimately acquitted – were part of an effort to cover up the cause of the physical abuse Plaintiff suffered.  These allegations suffice to state a claim for malicious prosecution.

Defendant's sole argument in its motion to dismiss the malicious prosecution claim is that the District Attorney – not the Defendants – was responsible for initiating the prosecution.  However, "defendants cannot hide behind the decision of the DA to prosecute when it was defendants who allegedly fed the facts" that resulted in the decision to bring charges. Blake v. Race, 487 F. Supp. 2d 187, 211 (E.D.N.Y. 2007); see also Zahrey v. Coffey, 221 F.3d 342, 352 (2d Cir. 2000) ("[I]t is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty."); Jones v. City of Chicago, 856 F.2d 985, 994 (7th Cir. 1988) ("[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial – none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision.").  Accordingly, Defendants' motion to dismiss the malicious prosecution claim is denied.

---

[7]     The Complaint asserts a malicious prosecution claim against Goldberg and Kadel as well.  However, the Complaint is devoid of any factual allegations supporting Goldberg and Kadel's participation in the filing of the disciplinary report.  For this reason, and the reasons stated below, all claims against Goldberg and Kadel are dismissed.

E.   Conspiracy Claim

Defendants also argue that the allegations in the Complaint are insufficient to support a conspiracy claim. A conspiracy claim under 42 U.S.C. § 1983 must allege: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 67, 72 (2d Cir. 1999). Moreover, "[i]t is well settled that claims of conspiracy 'containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.'" Gallop v. Cheney, 642 F.3d 364, 369 (2d Cir. 2011) (quoting Leon v. Murphy, 988 F.2d 303, 311 (2d Cir. 1993))

The Complaint alleges facts from which a Court might draw an inference that Powers, Haspil, O'Dell, Johnson, Enders, and ERT Members #1-#3 agreed among themselves to submits false reports about the assault against Plaintiff with the intent of causing disciplinary and criminal charges to be preferred against him. However, as employees of the WCJ, the same municipal entity, these Defendants were legally incapable of conspiring together. See Herman v. Moore, 576 F.2d 453, 459 (2d Cir. 1978) ("there is no conspiracy [under 42 U.S.C. § 1985] if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment"); Anemone v. Metropolitan Transportation Authority, 419 F. Supp. 2d 602, 604 (S.D.N.Y. 2006) (applying the intracorporate conspiracy doctrine articulated in Moore to actions brought under 42 U.S.C. § 1983). The Complaint also alleges that medical personnel employed by NYMC participated in a conspiracy to deprive Plaintiff of his constitutional rights, but

provides no factual support for these conclusory allegations.  Accordingly, the conspiracy claims are dismissed.

      F.       Liability of County and Certain Individual Defendants

           1.     Municipal Liability

Defendants move to dismiss all claims against the County.  A municipality may not be held liable under section 1983 on the basis of respondeat superior.  Monell v. Dep't of Social Servs., 436 U.S. 658 (1978).  Rather, at the pleading stage, a plaintiff must allege facts establishing that the constitutional violation was caused by a municipal policy or custom; that is, that the policy or custom was the actual "moving force" behind the alleged wrongs.  See id.; Bd. of the County Comm'rs v. Brown, 520 U.S. 400 (1997).  A plaintiff may plead a municipal policy or custom by alleging: "(1) a formal policy, promulgated or adopted by the entity; or, (2) that an official with policymaking authority took action or made a specific decision which caused the alleged violation of constitutional rights; or (3) the existence of an unlawful practice by subordinate officials that was so permanent or well settled so as to constitute a 'custom or usage,' and that the practice was so widespread as to imply the constructive acquiescence of policymaking officials."  Bektic-Marrero v. Goldberg, 850 F. Supp. 2d 418, 430 (S.D.N.Y. 2012) (citing Jouthe v. City of New York, 2009 WL 701110, at *7 (E.D.N.Y. March 10, 2009)).

      The Complaint adequately pleads the existence of a policy or custom of tolerating the use of excessive force under the third method cited above.  A plaintiff may plead liability under the third prong by showing that "the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions."  Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 126-27 (2d Cir. 2004).  To show that the municipality was deliberately indifferent to the improper conduct of its employees, "the plaintiff

must show that the need for more or better supervision to protect against constitutional violations was obvious." Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995).  A plaintiff may establish obviousness by showing that there were "repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."  Id; see also, Fiacco v. City of Rensselaer, 783 F.2d 319, 328 (2d Cir. 1986) ("[w]hether or not the claims had validity, the very assertion of a number of such claims put the City on notice that there was a possibility that its police officers had used excessive force").

Plaintiff relies primarily on the DOJ report, which documented extensive constitutional deficiencies in the provision of medical care and the protection of inmates against the use of excessive force.  The DOJ report's findings were based on on-site visits conducted in February 2008; its contents were published in November 2009.  Defendants contend that the DOJ report is, therefore, too dated to establish the existence of a policy or custom as of March 9, 2010 – the date on which Plaintiff was allegedly assaulted by the guards.  This argument is unavailing.  The Court is obligated to draw all reasonable inferences in Plaintiff's favor and thus takes as true for purposes of this motion practice the assertion that the deficiencies found by the DOJ existed at the time of the alleged assault against Plaintiff.  Cf. Jund v. Town of Hempstead, 941 F.2d 1271, 1288 (2d Cir. 1991) (there is a "general presumption of the continuance of a status or condition once proved to exist") (internal quotation marks omitted).  That presumption of continuity is fortified in this case by the fact that County officials publicly disputed the report's conclusion, and by the steady stream of suits filed against the County alleging excessive use of force in the WCJ.  Accordingly, the motion to dismiss the surviving claims against the County is denied.

2.      Individual Defendants – Spano, Cherverko, Amicucci, Diaz, Bailey-
Wallace, and Israel

The personal involvement of a defendant is an essential element of a section 1983

claim.  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).  A supervisor cannot be held liable

simply for being a supervisor, as there is no respondeat superior liability under section 1983.

See Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003).  The Second Circuit has held that

supervisory liability may attach under the following circumstances: "(1) actual direct

participation in the constitutional violation, (2) failure to remedy a wrong after being informed

through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting

to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly

negligent supervision of subordinates who committed a violation, or (5) failure to act on

information indicating that unconstitutional acts were occurring."  Hernandez v. Keane, 341 F.3d

137, 145 (2d Cir. 2003) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)).

There is disagreement within this district as to whether all five Colon categories

of supervisor liability remain viable after the United States Supreme Court's decision in Ashcroft

v. Iqbal, 556 U.S. 662, 676-77 (2009), and the Second Circuit has yet to address the issue.  See,

e.g., Reynolds v. Barrett, 685 F.3d 193, n.14 (2d Cir. 2012) (noting skepticism as to whether all

Colon factors survived Iqbal but not deciding the issue).  The Court agrees with the apparent

majority view that where, as here, "the constitutional claim does not require a showing of

discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference

standards of the Fourth, Eighth or Fourteenth Amendments, the personal involvement analysis

set forth in Colon v. Coughlin may still apply."  Sash v. United States, 674 F. Supp. 2d 531, 544

(S.D.N.Y. 2009); Inesti v. Hicks, 11 Civ. 2596(PAC), 2012 WL 2362626 at *11 (S.D.N.Y. June

22, 2012), adopted by, 2012 WL 3822224 (S.D.N.Y Sept. 4, 2012); Martinez v. Perilli, No. 09

Civ. 6470(WHP), 2012 WL 75249, at *4 (S.D.N.Y. Jan. 5, 2012); D'Olimpio v. Crisafi, 718 F.

Supp. 2d 340, 347 (S.D.N.Y. 2010), aff'd, 462 F. App'x 79 (2d Cir. 2012); but see Bellamy v.

Mount Vernon Hosp., No. 07 Civ. 1801(SAS), 2009 WL 1835939, at *6 (S.D.N.Y. June 26,

2009) ("Only the first and part of the third Colon categories pass Iqbal's muster – a supervisor is

only held liable if that supervisor participates directly in the alleged constitutional violation or if

that supervisor creates a policy or custom under which unconstitutional practices occurred").

       The Complaint alleges facts demonstrating widespread use of excessive force in

the WCJ.  It also alleges that Cheverko "held several positions with the responsibility of

supervising, investigating and/or overseeing WCJ's Emergency Response Team" (SAC ¶¶ 36,

37), that Amicucci was the Warden of WCJ (and thus vested with supervisory control), and that

both "knew or but for their deliberate indifference should have known of ERT's custom and

practice of use of excessive force, but failed to correct same through training, supervision or

discipline due to their grossly negligent, reckless or intentional conduct."  (SAC ¶ 68)  These

allegations fit squarely within the fourth and fifth Colon categories.  However, the Complaint

does not allege any facts indicating that those individuals were personally involved with the

decision to deprive Plaintiff of his Bible or bar him from attending group services.  Accordingly,

the Court finds that the SAC adequately pleads claims against Cheverko and Amicucci as to the

excessive force claim only.  All other claims against those individuals are dismissed.

       The Complaint also alleges that Diaz was Warden of the WCJ, that he was

responsible for supervising, investigating and/or overseeing WCJ's Emergency Response Team,

and that he was deliberately indifferent to the use of excessive force.  However, the Complaint

alleges that Diaz became Warden in June 2010, months after the alleged assault had taken place. The Complaint does not allege any facts supporting Diaz's personal involvement in any of the other acts underlying Plaintiff's remaining claims.  Therefore, all claims against Diaz are dismissed.

The Complaint does not allege any facts supporting Spano's liability under any of the Colon factors.  To the contrary, the Complaint pleads that Spano left his position at the DOC in December 2009, several months before the events underlying this Complaint took place. Accordingly, all claims against Spano are dismissed.

Because the Complaint fails to state a claim for unconstitutional denial of medical care, the claims against Bailey-Wallace and Israel are also dismissed.

II.      NYMC and NYCCSMS/CCS' Motions to Dismiss

Plaintiff brings federal and state causes of action against NYMC and NYCCSMS/CCS, and their employees Adler, Goldberg, Kadel, and Nurse Noe, arising out of the denial of medical care.  The federal claims against these Defendants are dismissed for the reasons stated above.  In light of the Court's dismissal of Plaintiffs federal claims, the Court declines pursuant to 28 U.S.C. § 1367(c)(3) to exercise supplemental jurisdiction of the state claims against these Defendants.

CONCLUSION

For the foregoing reasons, the County Defendants' motion to dismiss the Second Amended Complaint is granted with respect to Plaintiff's denial of medical care (Count II), conditions of confinement (Count V), and conspiracy claims.[8]  The Court declines to exercise

---

[8]      Plaintiff does not allege conspiracy in a stand-alone count.

supplemental jurisdiction of the state claims for medical negligence and infliction of emotional distress (Count IX).  The County Defendants' motion to dismiss is also granted with respect to Diaz, Spano, Bailey-Wallace, and Israel in all respects.  The Clerk of Court is directed to terminate Diaz, Spano, Bailey-Wallace, and Israel as defendants in this action.  The County Defendants' motion is denied in all other respects.

NYMC and NYCCSMS/CCS's motions to dismiss the federal claims in the Second Amended Complaint are granted in their entirety.  The Court declines to exercise supplemental jurisdiction of the state claims against NYMC, NYCCSMS/CCS, and the individual Defendants employed by these organizations; those claims are therefore dismissed without prejudice to re-filing in state court.  The Clerk of Court is directed to terminate NYMC, NYCCSMS, CCS, Adler, Goldberg, Kadel, and Nurse Noe as defendants in this action.

An Initial Pre-Trial Conference with respect to the remaining claims will be held in this matter on **November 2, 2012 at 3:45p.m.**

This Memorandum Order resolves docket entries nos. 66, 69, and 72.

SO ORDERED.

Dated: New York, New York
      September 27, 2012

LAURA TAYLOR SWAIN
United States District Judge